UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CLEO WILLIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:19 CV 952 RWS |
| ) | |
| ROCK HILL MECHANICAL ) | |
| CORP., et al., ) | |
| ) | |
| Defendant. ) | |

# **MEMORANDUM AND ORDER**

Plaintiff Cleo Willis was employed by Defendant Rock Hill Mechanical Corporation (Rock Hill) as a laborer.  In his amended complaint, Willis alleged that he was subjected to a hostile work environment based on race at a job site run by Defendant ACW Alliance (ACW).  Willis also alleged his employment was terminated based on race. Willis asserts that Rock Hill and ACW subjected him to unlawful discrimination in violation of Title VII.  Rock Hill and ACW have moved for summary judgment.  Because Willis has failed to establish his claims of employment discrimination I will grant Rock Hill and ACW summary judgment.

*Legal Standard*

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law. Lynn v. Deaconess Medical Center, 160 F.3d 484, 486 (8th Cir. 1998)(citing Fed. R. Civ. P. 56(c)). The party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of the affidavits, pleadings, depositions, answers to interrogatories, and admissions on file which it believes demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When such a motion is made and supported by the movant, the nonmoving party may not rest on his pleadings but must produce sufficient evidence to support the existence of the essential elements of his case on which he bears the burden of proof. Id. at 324. In resisting a properly supported motion for summary judgment, the plaintiff has an affirmative burden to designate specific facts creating a triable controversy. Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1113 (8th Cir. 2004).

Direct evidence of employment discrimination is rare, therefore, most cases rely on circumstantial evidence. In the absence of direct evidence of discrimination, courts employ the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)(Title VII case).

Under the burden-shifting analysis, the plaintiff must first establish a prima facie case of intentional discrimination. McDonnell Douglas, 411 U.S. at 802; Bashara v. Black Hills Corp., 26 F.3d 820, 823 (8th Cir. 1994). If the plaintiff

2

establishes a prima facie case, a presumption of discrimination is established and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. 411 U.S. at 802. The defendant need not persuade the court that the articulated reason was the basis of the employer's action; rather, it must simply provide some evidence of a non-discriminatory reason or reasons for its action. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509 (1993).

Upon the proffer of such evidence, the presumption of discrimination established by the prima facie case "simply drops out of the picture." Id. at 510-11. The burden then shifts back to the plaintiff to prove that the reason articulated by the employer was really a pretext for discrimination. Aucutt v. Six Flags Over Mid-America, Inc., 85 F.3d 1311, 1316 (8th Cir. 1995). A rejection of the employer's proffered non-discriminatory reason by itself or combined with elements of the prima facie case may be enough to establish, but does not compel, an inference of intentional discrimination. St. Mary's Honor Center, 509 U.S. at 511.

The burden of proving discrimination remains on the plaintiff at all times. Id. at 515-16. It is not enough to merely discredit defendant's articulated reason for the adverse employment action. A plaintiff must always establish that the real reason for defendant's action was impermissible discrimination. Id.; see also

Huston v. McDonnell Douglas Corp., 63 F.3d 771, 777 (8th Cir. 1995).  To avoid summary judgment, a plaintiff must present evidence that, when viewed in its entirety: (1) creates a fact issue as to whether the employer's proffered reason is pretextual, and (2) creates a reasonable inference that a discriminatory motive was a determinative factor in the adverse employment decision.  Rothmeier v. Investment Advisers, Inc., 85 F.3d 1328, 1336-37 (8th Cir. 1996).

## *Background[1]*

The incidents that give rise to Plaintiff Cleo Willis's claims of race discrimination arise from his employment as a laborer on a construction project at the Washington University Medical Center Campus.  Defendant ACW is a joint venture made up of three entities: Clayco, Inc., S.M. Wilson & Co., and Alberici Healthcare, LLC.  BJC Healthcare retained ACW as the general contractor for the construction project.  One of ACW's responsibilities was implementing BJC's safety regulations and rules for the project.  ACW hired Defendant Rock Hill as a subcontractor.  The Subcontractor Agreement between ACW and Rock Hill required Rock Hill to remove "any employee who creates an unsafe condition … or who violates the Contractor's Safety Procedures." [Doc. # 16-3, ¶ 2.10]  Rock

---

[1] The following background information is taken from Defendant Rock Hill's Statement of Uncontroverted Facts, Defendant ACW's Statement of Uncontroverted Facts, and Plaintiff Willis's Additional Uncontroverted Facts that the parties do not dispute.

4

Hill hired Willis[2] through a local union to work as a laborer on the project under Rock Hill's contract with ACW.  Willis's duties as a laborer included cleaning up behind the tinners and pipe fitters, and in the areas where they worked, getting ice, and taking trash from the floors to the dumpsters.  Jeff Johnson worked for Rock Hill and was Willis's supervisor.

On October 4, 2016, Dwight Schofield, a white laborer for another subcontractor, and Willis became involved in a confrontation.  The incident started when Willis noticed that Schofield was using Willis's house broom.  Willis testified at his deposition that when he asked for his broom back, Schofield cursed at him, approached him aggressively, and pushed / jammed the broom into Willis's stomach.  Willis was not hurt but he was shaken.  Willis testified he stepped back, cursed at Schofield, grabbed a shovel from his cart, held it like a bat and yelled for Schofield to get back or Willis would hit him with the shovel. [Doc. # 66-1, Ex. 1, Willis Dep. 94:2-96:15, 132:3-134:6]

ACW's Safety Manager Corey Hayes investigated the confrontation between Willis and Schofield.  Willis received a Written Safety Violation Notification which stated that Willis was observed using aggressive language during an interaction with another worker on site over a tool of the trade belonging to Willis. [Id., Ex. 5]  Schofield received a similar Written Safety Violation

---

[2] Willis identifies himself as an "African American as well as black." [Doc. # 66-1, ¶ 8:23-24, Willis Dep.]

Notification for his part in the incident. [Id., Ex. 11] Neither Willis nor Schofield were removed from the construction site over the incident.

Less than a month later Willis was involved in a second altercation with an elevator operator. Some elevators on the job site were designated for employees only to move manpower without material or carts. Other elevators were used to move carts or equipment. On November 1, 2016, an elevator operator, Lela Murrell, did not allow Willis to use the elevator she was controlling to transport a cart because the elevator was designated for manpower only. The next day, on November 2, 2016, Willis pushed his cart onto an elevator controlled by Murrell that was designated for manpower only. Murrell submitted a statement that she told Willis no carts were allowed on that elevator. She stated that Willis cursed her loudly and refused to take the cart off. Willis told her he was going to stay. Murrell called "the office" on her phone. She handed the phone to Willis and while he was talking she removed his cart from the elevator. Willis returned the phone and Murrell took the elevator to another floor. [Id., Ex. 9, pp. 11-12]

Willis denies that he raised his voice to Murrell. [Doc. # 71, Ex. A, Willis Dep. 75:11-15] He testified at his deposition that he was carrying ice and water to the floors and that he was allowed to use any elevator when transporting ice and water. [Id.,118:1-25] This assertion was not supported by any other evidence.

After this incident was over, Jeff Johnson, a Rock Hill general foreman on

6

the site, got a call from the ACW office to bring Willis to the office. Johnson escorted Willis to the office where they were asked to come into a conference room by Dean Froth, a manager from S.M. Wilson (the W in ACW). Dean told Johnson to escort Willis off the project site. [Doc. # 66, Ex. 3, Johnson Dep. 45:3-48:25] There is a dispute over whether Willis was told he was fired at that time or simply escorted off the job site.[3] Thereafter, ACW issued a Written Safety Violation Notification to Rock Hill which required Rock Hill to remove Willis from the project for a period of a year for repeated safety violations. [Doc. # 69, Ex. 11] The notification stated that Willis was observed in violation of the workplace harassment policy regarding the incident at the elevator. Rock Hill did not have any other projects requiring laborers at the time.

Both ACW and Rock Hill have moved for summary judgement. Willis opposes their motions.

### *Discussion*

*Willis's disparate treatment* claim

In his amended complaint Willis asserts a disparate treatment claim based on race discrimination under Title VII, 42 U.S.C. § 2000e, *et seq.* "Title VII prohibits

---

[3] Rock Hill's Statement of Uncontroverted Facts states that "ACW told Willis he was fired, and asked Jeff Johnson to escort Plaintiff from the project." [Doc. # 66 ¶ 26] But two of the citations in support (Hayes and Johnson depositions) do not the support statement that ACW told Willis he was fired. These deposition citations indicate that the ACW manager told the Rock Hill Manager to remove Willis from the job site. In his deposition, Willis testified that the ACW manager told him he was fired. [Id., Ex. 1, 59:7-18] ACW's Statement of Uncontroverted Facts states that ACW requested Rock Hill to escort Willis from the property, citing Johnson's deposition. [Doc. # 69, ¶ 20]

7

employers from discharging an employee because of race or gender and from treating employees differently with respect to the 'terms, conditions, or privileges' of employment." Palesch v. Missouri Comm'n on Hum. Rts., 233 F.3d 560, 568 (8th Cir. 2000) (quoting 42 U.S.C. § 2000e-2(a)(1)).  Willis asserts he suffered an adverse employment action when his employment was terminated after the incident on the elevator.  He argues that he was treated differently than white workers who were not terminated for their inappropriate workplace behavior.

To establish a prima facie case for a disparate treatment claim, Willis must show that: (1) he is a member of a protected class; (2) he was meeting the legitimate expectations as to his duties; (3) he suffered an adverse employment action; and (4) circumstances give rise to an inference of discrimination because similarly situated employees, who were not members of the protected group, were treated differently.  Gilooly v. Missouri Dept. of Health and Senior Services, 421 F.3d 734, 737-739 (8th Cir. 2005).

As an African American, Willis is a member of a protected class.  Before the incidents that lead to Willis being removed from the job site he was generally meeting the legitimate expectations as to his duties.[4]  It is undisputed that he suffered an adverse employment action when he was removed from the BJC project worksite and barred from returning for a year.  But Willis has not identified

---

[4] Although he was counseled for preaching his religious and political views to workers in other trades.  [Doc. # 71, Ex. 2, Johnson Dep. 17:7-18:13]

a similarly-situated employee, who is not a member of a protected class, who was treated more favorably. As a result, he has failed to establish a prima facie case of disparate treatment.

In support of his claim Willis argues that he was treated differently than the white elevator operator involved in the water cart incident. He asserts that while he was fired over the incident her job was not terminated. However, Willis does not provide any evidence that they were similarly situated. Willis had been issued two safety violations in a month, the first involving the broom altercation with Schofield. Willis does not provide any information regarding the elevator operator's disciplinary record. Willis also argues that he was treated differently than Schofield. However, both he and Schofield received the identical safety violation for their altercation and there is not any evidence in the record that Schofield received any other safety violations.

Willis argues that two white workers were involved in a fist fight on the BJC but neither of them were terminated. This altercation involved two members of separate trades, a drywaller and a sheet metal worker. One punched the other and they were both removed from the job for three days. [Doc. # 71, Ex. 2, Johnson Dep. 17:7-18:13] These workers were not similarly situated to Willis. Willis has not produced any evidence that they received a second safety violation notification like Willis had received. Moreover, these men worked in different trades for

different supervisors. They were not similarly situated to Willis. See Bennett v. Nucor Corp., 656 F.3d 802, 819 (8th Cir. 2011) ("In a case involving allegations of discriminatory disciplinary practices, for example, this court explained that to be similarly situated, the comparable employees must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.") (internal quotations and citation omitted).

Even if Wills established a prima facie case, ACW and Rock Hill have come forward with a legitimate, non-discriminatory reason for Willis's removal from the job. His two confrontations with other job site personnel led to the decision to remove him from the project. At this point the presumption of discrimination established by a prima facie case "simply drops out of the picture." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510 (1993). Willis argues that this ground for his removal was a pretext. Willis makes an overarching argument that racial animus in Willis's termination can be inferred from the overall environment of simmering racism at the construction site. He asserts there was racial tension due to the 2016 election, that racial graffiti had been found in restrooms, that some construction workers had made racially hostile statements, and that trash was being strewn about by white workers for Willis to pick up. These allegations will be addressed below in Willis's hostile work environment claim. But these allegations

fail to create a reasonable inference that a discriminatory motive was a determinative factor in Dean Froth's decision to remove Willis' from the job site. As a result, I find that ACW and Rock Hill are entitled to summary judgment on this claim.

*Willis's hostile work environment claim*

Willis asserts a claim for a hostile work environment under Title VII based on race.  "Hostile work environment harassment occurs when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Palesch v. Missouri Comm'n on Human Rights, 233 F.3d 560, 566 (8th Cir. 2000) (cleaned up).  A court must keep in mind that "[n]ot all unpleasant conduct creates a hostile work environment." Id. at 567. (cleaned up).  The conduct at issue must not be merely rude or unpleasant or involve a few isolated incidents. Blomker v. Jewell, 831 F.3d 1051, 1057 (8th Cir. 2016) (cleaned up).  The harassment must be "so intimidating, offensive, or hostile that it poisoned the work environment." Id. (internal quotations omitted). Gilooly v. Missouri Dep't of Health & Senior Servs., 421 F.3d 734, 738 (8th Cir. 2005) (internal quotation omitted).  The conduct at issue must be severe or pervasive enough to be an objectively hostile environment. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). "[T]he objective severity of harassment should be judged from

11

the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."

Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)(internal quotation omitted). In addition, the plaintiff must subjectively perceive the environment to be abusive. Harris, 510 U.S. at 21. A court is required to look at all of the attendant circumstances, including the frequency of the purported harassment; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance. Willis v. Henderson, 262 F.3d 801, 809 (8th Cir. 2003).

In order to establish a claim of hostile work environment racial harassment by non-supervisory co-workers, a plaintiff must establish that: (1) he belongs to a protected group; (2) he was subject to unwelcome harassment; (3) that the harassment was based on race; (d) that the harassment affected a term, condition, or privilege of employment; and (e) that the employer knew or should have known of the harassment and failed to take proper remedial action. Palesch, 233 F.3d at 566.

Willis asserts the following evidence in support of his hostile work environment claim. In an earlier elevator investigation (details and personnel

unknown) in which a worker commented in a written statement: "If we need to remain professional, then the African-American workers need to do the same. It feels like they are throwing the Michael Brown / Wilson shit in our face and we don't appreciate it." [Doc. 69, Ex. 2, Hayes Dep. 36:19-37:5][5] The worker was not disciplined for this statement. Willis does not present any other specific admissible statement of racial animus. This statement appears to be an offensive utterance that does not by itself, or in combination with Willis's other assertions, create a hostile work environment.

Willis asserts that the workplace had racial tension based on the 2016 election, the unrest in Ferguson, and the Colin Kaepernick controversy. [Doc. # 71, Ex. A, Willis Dep. 269:14-18, 287:24-25; 288:1-3, 243:9-15, 269:5-13] Willis does not elaborate on how this racial tension created a workplace that was so intimidating, offensive, or hostile that it poisoned the work environment.

Willis presented evidence that there was racial graffiti in job site bathrooms but that ACW had painting crews that removed the graffiti. [Id., 269:19-25-270:1-25, 276:13-25] Willis's deposition testimony states the bathrooms were checked

---

[5] Willis also testified that he was told by a union official that Schofield had said, at some unspecified time, that "[B]lacks do not deserve to work here." [Doc. # 71, Ex. A, Willis Dep. 274:4-18] This statement is hearsay under Fed. R. Evid. 801 and is inadmissible under Fed. R. Evid. 802.

13

every day and if any graffiti was found it was painted over.  [Id., 276:13-25]  ACW did not ignore this issue and responded by addressing this issue on a daily basis.

Willis claims he was denied the use of the elevator that led to his removal because he was black.  However, in his deposition Willis was asked two times if he was denied access to the elevator based on race and he demurred.  [Id., 245:6-25 – 247:1-6]  There is not any evidence in the record to support an allegation that Willis was denied access to the elevators because he was black.

Willis asserts that he was forced to bend down and crawl to pick up trash strewn across the ground by racially motivated co-workers.  [Id., 65:12-25, 67:5-10]  Willis's job as a laborer was to pick up the trash created by construction workers at the job site.  His subjective perception that the workers threw trash down in a particular fashion as a racially motivated behavior is not supported by any objective evidence.

Lastly, Willis claims that a noose was found on the site less than a month after he was removed from work.  [Id., 67:11-25-68:1-24]  The fact that a noose was found weeks after Willis left the project does not support his claim for a hostile work environment while he worked at the job site.  Moreover, management swiftly responded to the noose incident offering a $20,000 reward for information

14

about the incident. According to Willis, a carpenter was identified as the culprit. [Id., 277:6-9]

Willis asserts that he complained to management about race discrimination. [Id., Ex. D., Rock Hill's Resp. to Pl.'s Interrog. 16] On September 2 and 5, 2016, Willis wrote two letters to management complaining about his interaction with police / security guards in the parking garage. Willis was allegedly parking in the hospital garage despite a direction that the site workers were supposed to park for free in a lot down the street. Willis complained that this interaction was because of his race. [Doc. # 69, Ex. 7, Johnson Dep. 41:21-25-42:1-24] Willis also complained that he was mistreated in his October 4, 2016 altercation with Schofield based on his race. After his altercation with the elevator operator, just prior to learning that he was being removed from the job site, Willis advised Johnson that he felt he was being treated differently because of his race. [Doc. # 71, Ex. D., Rock Hill's Resp. to Pl.'s Interrog. 16]

None of these complaints put ACW or Rock Hill on notice that Willis was complaining about a hostile work environment. The complaint about the police / security officers concerned Willis impermissibly parking the hospital BJC garage. Willis complaint about Schofield was resolved when both men were given safety violation notifications. Willis's complaint that he felt he was being treated unfairly

15

because of his race over the elevator incident, when he was called to the office to be removed from the project, did not put ACW and Rock Hill on notice that Willis was making a hostile work environment complaint.

Based on the foregoing, I find that Willis has failed to present evidence which would support his claim of a hostile work environment. As a result, I will grant ACW and Rock Hill summary judgment on this claim.

### *ACW's Alternative Grounds for Summary Judgment*

ACW has also moved for summary judgment on the alternative grounds that it was not Willis's employer, and if it was, ACW is not a suable entity.

Willis admits in his deposition that he was not an employee of ACW. [Doc. # 72, Pl.'s Resp. to ACW's Stat. of Uncon. Facts ¶ 9] However, in his brief he argues that ACW is a joint employer under common law. In a joint employer relationship

> there is no single integrated enterprise. The joint employer analysis assumes separate legal entities exist, but that they have chosen to handle certain aspects of their employer-employee relationships jointly. A finding of joint employer is proper where one company has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer.

Scheidecker v. Arvig Enterprises, Inc., 122 F. Supp. 2d 1031, 1038 (D. Minn. 2000)(cleaned up).

It is undisputed that Willis was employed by Rock Hill.  Rock Hill hired and had the ability to terminate Willis's employment.  Willis received his pay and benefits from Rock Hill.  Rock Hill manager Jeff Johnson provided Willis with daily supervision.  Rock Hill provided the tools for Willis to perform his work.  Willis did not report to any manager at ACW for his daily work assignments.  After being removed from the BJC project Rock Hill did not have any other projects that required laborers.

Willis agues several conditions support his joint employer claim including that he had to comply with BJC's safety protocols that were implemented by ACW.  The ACW safety manager Corey Hayes had the power to site Willis for safety violations.  ACW would occasionally request subcontractors to send their labors to certain areas on the site so ACW could point out places where there was trash or debris that needed to be cleaned up at the job site for safety concerns.  And, that ACW had the power to remove subcontractor employees from the project over safety violations.

None of these conditions establish that ACW retained for itself sufficient control of the terms and conditions of employment of the Willis to be deemed a joint employer.  There is not any evidence that ACW exercised daily control of the manner and means that Willis performed his job.  Willis was managed on a daily

17

basis by his Rock Hill supervisor. The fact that an ACW could site Willis for safety violations does not support the claim that ACW was his employer. And, when ACW decided to remove Willis from the project ACW contacted Willis's Rock Hill supervisor, Jeff Johnson, and asked him to bring Willis to the office. Then ACW requested Johnson to escort Willis from the job site. Willis was still employed by Rock Hill, yet Rock Hill did not have any other projects that needed laborers. Based on the foregoing, Willis has not presented sufficient evidence to support his claim that ACW was a joint employer. As a result, I will grant ACW's motion for summary judgment on the grounds that ACW was not Willis's joint employer.

Finally, ACW asserts that it is not a suable entity because it was a joint venture that is analogous to a partnership. Under Missouri law, a joint venture is treated legally as a partnership and "is not regarded as a separate legal entity and cannot sue or be sued." Sarasohn & Co. v. Prestige Hotels Corp., 945 S.W.2d 13, 16 (Mo. Ct. App. 1997). However, Fed. R. Civ. P. 17(b)(3)(A) permits a partnership, with no capacity to sue or be sued under state law, to sue or be sued in its own name to enforce a substantive right existing under the United States Constitution or laws. In the present case Willis is suing to enforce his civil rights under Title VII. ACW contends that Rule 17 does not apply to it because state law

does grant partnerships the right to sue or be sued but mandates the capacity to do so is held by the individual partners in the action. ACW cites to the case of Lundquist v. Univ. of S. Dakota Sanford Sch. of Med., for this proposition. 705 F.3d 378, 381 (8th Cir. 2013). Such an interpretation of the holding in Lundquist would completely undermine the express language of Fed. R. Civ. P. 17(b)(3)(A). The Lundquist decision did not turn on the existence of a partnership. The party challenging the capacity to be sued was the University of South Dakota Sanford School of Medicine. The court found that the state legislature did not deny the University and its School of Medicine the capacity to sue or be sued. Rather, the state legislature mandated that the capacity to do so resided in the Board of Regents, the unit of government that controlled the University. Id. at 381. In its reply brief, ACW interpreted the holding as "the [Rule 17] exception does not apply because state law specified how a partnership has capacity to be sued." [Doc. # 76 at 8] This is not the holding of Lundquist. Lundquist involved a state legislature mandating how a state entity had the capacity to sue and be sued. It did not hold that all partnerships can avoid the capacity exception of Rule 17 because the partnership's partners have the capacity to sue and be sued. As, a result, ACW's assertion that the exception of Fed. R. Civ. P. 17(b)(3)(A) applies in this case is without merit.

Accordingly,

**IT IS HEREBY ORDERED that** Defendant ACW Alliance's motion for summary judgment [67] is **GRANTED**.

**IT IS FURTHER OREDER that** Defendant Rock Hill Mechanical Corporation's motion for summary judgment [64] is **GRANTED**.

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 30th day of September, 2021.